In the INTEREST OF XENA X. D.-C., a Child Found To Be In Need of Protection or Services:

STATE of Wisconsin, Petitioner-Respondent,

v.

TAMMY L. D., Respondent-Appellant.

Court of Appeals

*No. 99–1962. Submitted on briefs July 13, 2000.—Decided August 2, 2000.*

## 2000 WI App 200

(Also reported in 617 N.W.2d 894.)

On behalf of the respondent-appellant, the cause was submitted on the briefs of *William J. Grogan* of Appleton.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *Karen L. Seifert*, assistant corporation counsel.

Before Brown, P.J., Nettesheim and Anderson, JJ.

¶ 1. NETTESHEIM, J. Tammy L. D. appeals from a CHIPS dispositional order of the juvenile court that placed her daughter Xena X. D.-C. in foster care following an earlier finding that Xena was in need of protection or services. Tammy was not represented by advocacy counsel during the CHIPS proceedings. Her chief complaint is that the juvenile court did not exercise its discretion whether to appoint an attorney to represent her. We agree. We reverse and remand with directions that the juvenile court consider Tammy's

request for court-appointed counsel. Depending on the outcome of that proceeding, the court shall appoint counsel for Tammy and conduct a new trial, or the court shall reenter the dispositional order.

¶ 2. Tammy also complains that the juvenile court appointed a guardian ad litem for her without first determining her competency. We reject this argument.

## Facts and Procedural History

¶ 3. We set out the facts and history of this case in some detail. During the early morning hours of April 10, 1999, the City of Neenah Police Department had a series of contacts with Tammy. Xena was present with Tammy during all of these contacts. The contacts resulted from complaints to the police from Tammy herself, her boyfriend and a neighbor. During these contacts, the police observed Tammy to be irrational, emotionally upset and intoxicated. In addition, Tammy's apartment was in disarray and, during one contact, the police observed a grease fire on the stove. After the third contact, the police took Xena into protective custody and a juvenile court intake worker executed a request for Xena's temporary physical custody. Tammy was also taken into custody for evaluation.

¶ 4. On April 12, 1999, Judicial Court Commissioner Daniel J. Bissett conducted a hearing on the request for Xena's temporary physical custody. Tammy appeared without counsel. At the outset of the hearing, the commissioner advised Tammy of her various rights, including the right to an attorney. However, the commissioner qualified this explanation by stating that the public defender's office would not provide representation and that if Tammy desired representation,

she would have to hire her own attorney. Tammy responded that she did not have the money to hire an attorney. The commissioner responded, "That wasn't the question. You understand that you have the right to have an attorney?" Tammy responded that she understood.

¶ 5. At the conclusion of the hearing, Commissioner Bissett directed that Xena remain in temporary physical custody and ordered Tammy to undergo alcohol and drug assessment and a psychological evaluation.

¶ 6. Doctor Allen Hauer conducted the psychological examination. In his report to the court, Hauer noted that Tammy "spoke in an extremely pressured manner, flipped from one subject to another without transition, and spoke in such vague generalities at times that she was difficult to understand. Her verbalizations were significant for themes of grandiosity and persecution, her thoughts were idiosyncratic and frequently illogical, and she was excessively suspicious of others." He described Tammy's recent behavior as "irrational and illogical" and her thought processes as "confused and disorganized." He viewed Tammy's responses and behavior during the interview as suggestive of a mental illness. While his opinions were tentative based upon this preliminary examination, Hauer opined that Tammy was likely to become "confused and preoccupied" during periods which she perceived as threatening. Hauer suggested that Tammy seek formal mental health assistance "to stabilize her psychological status." Hauer also suggested that Tammy "seek legal representation to assist her in her current situation."

¶ 7. On April 15, 1999, Winnebago county filed a CHIPS petition alleging that Xena was in need of pro-

tection or services. On April 22, Commissioner Bissett conducted a review hearing regarding Xena's temporary placement and an initial appearance on the CHIPS petition. Tammy again appeared without counsel. Xena's father, Richard C., also without counsel, appeared by telephone from the county jail where he was being held in custody. Richard asked for counsel. The commissioner responded that he would have to hire an attorney. Tammy stated that she had sought free legal counsel, but that "the laws on free representation for cases of this nature just recently changed. I was not allowed a public defender."

¶ 8.  Commissioner Bissett then advised both parents of their rights. As related to counsel, the commissioner stated:

> You do have a right to be represented by an attorney. Although the public defender's office no longer appoints attorneys for parents in these types of proceedings, both of you do have the right to consult with and retain an attorney of your own choosing and you may do so at any stage in the proceedings.

¶ 9.  After further explaining the nature of a CHIPS proceeding, Commissioner Bissett advised Tammy that she could admit, deny or enter a no contest plea to the petition. Tammy replied, "No contest." However, during the ensuing dialogue, it became apparent that Tammy disagreed with the allegations of the petition and that her plea was based on her belief that "I cannot afford to go to trial." The commissioner explained that going to trial "doesn't cost you anything" and that Tammy could represent herself.

¶ 10.  Commissioner Bissett continued to explore Tammy's plea options. Although Tammy still refused to enter a denial, she also continued to challenge the

allegations in the petition. In addition, she gave conflicting and sometimes rambling responses to some of the commissioner's questions. Ultimately, the commissioner entered a denial on Tammy's behalf.[1] He also appointed a guardian ad litem to represent Tammy's interests "in light of Dr. Hauer's evaluation as well as my discussions on the record today with the mother. I believe that that is appropriate . . . in light of the mother's limitations." However, the commissioner also stated, "I'm not going to appoint adversary counsel . . . ." The commissioner then adjourned the review of Xena's temporary physical placement and the initial appearance to April 27.

¶ 11.   At the adjourned hearing, Tammy again appeared without counsel, but her guardian ad litem, Attorney Erik Forsgren, was present. When Commissioner Bissett asked for Tammy's plea, Forsgren stated, "I believe that it would be in the best interest of the mother at this time to enter a no contest plea regarding this dispositional, however, it is my understanding that she chooses to contest the hearing." Tammy confirmed that this was her wish and Commissioner Bissett accepted the denial as Tammy's plea. The balance of the hearing was devoted to the issue of Xena's continued temporary physical placement. At the conclusion of the hearing, the commissioner continued the previous placement order and scheduled the matter for a bench trial in the juvenile court on May 17.

¶ 12.   At the trial, Tammy once again appeared without counsel, but with Forsgren as her guardian ad litem. The juvenile court did not address the matter of legal representation for Tammy and the matter proceeded directly to trial. The county offered the

---

[1] At the same time, Commissioner Bissett accepted the father's plea of no contest to the CHIPS petition.

testimony of Hauer, a social worker and the police officer who had responded to the calls on April 10. Tammy responded with her own testimony, disputing some of the events of April 10, and portions of Hauer's testimony. She also explained that she was not working and was receiving unemployment compensation in the amount of $186 per week which was scheduled to expire the first week in June. Following the close of the testimony, the court heard recommendations from the attorneys, including Tammy's guardian ad litem who agreed with the county's request that the court make a CHIPS finding. Tammy was not asked to participate in this phase of the proceedings. Following these statements, the court determined that the county had met its burden of proof under WIS. STAT. § 48.13(8) and (10) (1997–98)[2] and the court made a CHIPS finding that Xena was in need of protection or services. The court scheduled the dispositional hearing for June 14, 1999.

¶ 13. At the conclusion of this hearing, the following exchange took place between Tammy, the juvenile court and Karen Seifert, the assistant corporation counsel:

> [TAMMY]: I would like to request a court-appointed attorney. I received a little bit of counseling from writing Chief Judge Haase, as I went to the public library. I was a little bit too late in writing because the computer—
>
> THE COURT: I don't have any information, ma'am, on that.
>
> [TAMMY]: He advised me to request a court-appointed attorney.

---

[2] All references to the Wisconsin Statutes are to the 1997–98 version unless otherwise noted.

THE COURT:   I received a copy of Judge Haase's letter to you.[3] I don't have any information at this time, ma'am, to determine whether you're eligible or not. You may want to contact Legal Services. They represent people in these cases.

MS. SEIFERT:   I don't know, Your Honor. I know the public defender does not, and I, for the most part—

THE COURT:   You understand, you do have an attorney, a Guardian ad Litem for you, Mr. Forsgren?

[TAMMY]:   He's not my attorney, Your Honor.

THE COURT:   Well, he's been appointed Guardian ad Litem for you in this case, so he is representing your interests to a certain degree. Do you understand that?

[TAMMY]:   Okay. Well, part of it. I don't because I'm not mentally incompetent.

THE COURT:   What I would suggest you do, first, ma'am, is contact Legal Services and see if they'll represent you. See if you qualify for representation through their office.

[TAMMY]:   Okay.

¶ 14.   At the dispostional hearing, Tammy again appeared without counsel. The department of social services' dispositional report recommended that the court enter a CHIPS order. Forsgren, Tammy's guardian ad litem, joined in this request as did all of the other interested parties, save Tammy. She asked that Xena be returned to her. The court followed the department's recommendations, ordering that Xena be placed under the supervision of the department for a period

---

[3] Judge Haase's letter is not part of the appellate record.

not to exceed one year and remain outside the parental home in foster care.

¶ 15. Tammy, now represented by counsel, appeals.

## Discussion

¶ 16. Tammy's principal argument is that the juvenile court, whether acting through the court commissioner or the juvenile court judge, did not exercise its discretion whether to appoint counsel for her.

¶ 17. We begin with the supreme court's decision in *Joni B. v. State*, 202 Wis. 2d 1, 549 N.W.2d 411 (1996). The issue in *Joni B.* was the constitutionality of the then recently enacted provision of WIS. STAT. § 48.23(3) that prohibited a juvenile court from appointing counsel for anyone but the child in a CHIPS proceeding. *See Joni B.*, 202 Wis. 2d at 4–5. The court concluded that the amendment was unconstitutional because "fundamental fairness requires that a circuit judge be given the discretion to make the determination of what due process requires on a case-by-case basis," which in some cases may mean the appointment of counsel. *Id.* at 18.

¶ 18. *Joni B.* recognized that courts have the inherent power to appoint counsel and that such power was not derived from an individual litigant's constitutional right to counsel. *See id.* at 10. Rather, this power was "inherent to serve the interests of the circuit court." *Id.* (citation omitted). *Joni B.* also recognized that circumstances may be present in unique cases where circuit courts may find "a compelling judicial need for appointment of an attorney for a party even though that party may have neither a constitutional

nor a statutory right to counsel." *Id.* at 10–11. Such appointments are appropriate "in furtherance of the court's need for the orderly and fair presentation of a case." *Id.* at 11.

¶ 19.  In addition, *Joni B.* addressed the due process and fundamental fairness implications of the legislative restriction placed on the court's authority to appoint counsel for a parent in a CHIPS case. *See id.* at 12. The supreme court drew guidance from the United States Supreme Court's decision in *Lassiter v. Department of Social Services*, 452 U.S. 18 (1981), noting that an indigent parent's right to due process only mandates that counsel be appointed automatically when physical liberty is at stake. *See Joni B.*, 202 Wis. 2d at 12. However, *Lassiter* also concluded that trial courts must still determine whether due process necessitates the appointment of counsel on a case-by-case basis. *See Lassiter*, 452 U.S. at 26, 32. As guidance, the *Lassiter* Court devised a test, later adopted by our supreme court in *Piper v. Popp*, 167 Wis. 2d 633, 647, 482 N.W.2d 353 (1992), to facilitate the determination of whether due process requires that counsel be appointed in a given situation:

> First, a court must balance the following elements of due process against each other: the private interests at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions. The "net weight" of these elements is then balanced against the presumption that a right to counsel exists only when personal freedom is jeopardized.

*Joni B.*, 202 Wis. 2d at 13 (citations omitted).

¶ 20. In this case, the private interest at stake is the "parent's interest in the 'companionship, care, custody, and management of his or her children,' " which "undeniably warrants deference and, absent a powerful countervailing interest, protection." *Id.* (quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). Additionally, parents have "a particularly 'commanding' interest in the 'accuracy and justice' of proceedings that could end the parent-child relationship." *Id.* at 13–14 (quoting *Lassiter*, 452 U.S. at 27). Although *Joni B.* involved a CHIPS proceeding, while *Lassiter* involved a termination of parental rights, the court in *Joni B.* recognized that a parent's interest in a CHIPS proceeding is far from "minimal" because a dispositional order in CHIPS proceedings can serve as a precursor to a later termination proceeding. *See id.* at 14–15.

██

¶ 21. *Joni B.* also observed that the parent and the State share a joint interest in a "just and accurate outcome where the welfare of a child is concerned." *Id.* at 15 (citation omitted). "[T]his interest might be best served in an adversary setting where both the State and the parents are represented by counsel because 'just results are most likely to be obtained through the equal contest of opposed interests.' " *Id.* (quoting *Lassiter*, 452 U.S. at 28). While acknowledging the legitimacy of the State's pecuniary interests in not appointing counsel, *Joni B.* nevertheless concluded that in some cases, such an interest would not outweigh the shared interest "in a just and accurate result which will require the 'equal contest' of counseled adversary proceedings." *Id.* at 16.

¶ 22. In discussing the final due process factor—risk of erroneous outcome—*Joni B.* found that

CHIPS proceedings pose many of the same dangers that *Lassiter* observed in termination proceedings:

> Parents involved are "likely to be people with little education, who have had uncommon difficulty in dealing with life, and who are, at the hearing, thrust into a distressing and disorienting situation." They may be confronted with medical and psychiatric testimony which few people are "equipped to understand and fewer still to confute . . . ." The issues may be complex and the testimony laced with hearsay and evidentiary pitfalls, escalating the risks of erroneous deprivation.

*Joni B.*, 202 Wis. 2d at 16 (quoting *Lassiter*, 452 U.S. at 30).[4]

¶ 23. In the instant case, other than Commissioner Bissett's isolated statement at the initial appearance on the CHIPS petition that "I'm not going to appoint adversary counsel," the question of providing appointed counsel for Tammy was not otherwise addressed, even in the face of her requests for counsel and her statements that she could not afford counsel.

---

[4] In conducting the balancing called for above, the court in *Joni B. v. State*, 202 Wis. 2d 1, 19, 549 N.W.2d 411 (1996), recommended that courts also consider—but not exclusively:

—the personal characteristics of the parent, such as age, mental capacity, education, and former contact with the court;

—the parent's demonstrated level of interest in the proceedings and desire to participate;

—whether the petition alleges incidents of abuse or neglect which could lead to criminal prosecution;

—the complexity of the case, including the likelihood of the introduction of medical or psychological evidence;

—the probability of out-of-home placement and potential duration of separation, based on the allegations in the petition and the social worker's recommendation.

Moreover, whenever the question of Tammy's representation was addressed, it was always accompanied by a statement that the public defender no longer provided representation for parents in a CHIPS proceeding and that Tammy would have to hire her own lawyer.

¶ 24. The practical effect of this advice was to leave Tammy with the belief that her only options were to hire her own attorney or represent herself. But as *Joni B.* reveals, this was an incorrect and incomplete statement of the law. The message from *Joni B.* is that the juvenile courts of this state have the discretionary authority on a case-by-case basis to appoint counsel for a parent in a CHIPS case. *See id.* at 18.

¶ 25. At various stages of the proceedings, Tammy expressed a desire for counsel. She advised the court commissioner at the initial appearance that she did not have the money to hire an attorney. The commissioner responded by simply confirming Tammy's understanding of her right to an attorney, but did not further explain that the court had the authority to appoint an attorney. At the next appearance, Tammy stated to the court commissioner that she had sought free legal counsel, but the public defender would not represent her. The court commissioner responded by confirming that the public defender would not provide representation, and then adding "you do have the right to consult with and retain an attorney of your own choosing." At the conclusion of the fact-finding portion of the CHIPS trial, Tammy expressly asked the juvenile court for a court-appointed attorney and explained that she had contacted the chief judge on the matter. The court responded that it had no information as to Tammy's eligibility and suggested that she consult the legal services office.

¶ 26. Besides these requests for counsel, Tammy also gave indications which seriously questioned her ability to meaningfully represent herself. By the time of the second appearance, Commissioner Bissett had Hauer's psychological evaluation in hand. This report noted Tammy's confused and disorganized thought processes and her irrational and illogical responses—all suggestive of a mental illness. Hauer recommended that Tammy receive treatment from "formal mental health resources to stabilize her psychological status." More significantly, Hauer recognized that Tammy should "seek legal representation to assist her in her current situation."

¶ 27. Hauer's impressions were borne out in the subsequent proceedings. At the plea hearing, Tammy initially entered a plea of no contest, but quickly backpedaled during the ensuing colloquy with Commissioner Bissett. Tammy thought she could not contest the petition because she could not afford to go to trial. Upon clarification, Tammy still did not enter a denial because she did not think the matter even deserved a trial. She also stated that she felt "molested" and "ransomed" by the system. The commissioner's further attempts to complete a proper plea colloquy were unsuccessful. Instead, the commissioner entered a denial on Tammy's behalf, appointed a guardian ad litem and adjourned the proceeding.

¶ 28. The trial also reflected Tammy's inability to effectively represent herself. In this proceeding, she was nearly a nonfactor. The county called three witnesses: Hauer, a social worker and the police officer who responded to the calls on April 10. Tammy did not conduct any cross-examination of these witnesses. Nor did she call any witnesses on her own behalf. She did testify, but her testimony was limited to minimizing

the circumstances that the officer had described and questioning the significance of Hauer's evaluation. Nor did she offer any evidence to show that the events precipitating these proceedings were an aberration or that she was in fact a good parent.[5] We also observe that Tammy was not invited to participate in the final arguments.

¶ 29. We are also concerned that when the case arrived before the juvenile court for trial, the court did not make any inquiry of Tammy regarding her pro se status and whether she wished, or was competent, to represent herself. Instead, the matter proceeded directly to the evidentiary phase of the trial. Perhaps the court believed that the prior proceedings before the court commissioner sufficiently established that Tammy did not want a lawyer or was competent to represent herself.[6] However, as the foregoing discussion reveals, we disagree. Or perhaps the court believed that it had no duty or authority to even address the matter. But, as we have explained, *Joni B.* confers the court with discretion to appoint counsel for a parent in the appropriate case.

■■

¶ 30. In summary, the particular facts and circumstances of this case demonstrated a need for the juvenile court, whether acting through the judge or the court commissioner, to exercise the discretion conferred by *Joni B.* whether to appoint counsel for Tammy. Instead, the information provided to Tammy left her with the impression that her only recourse was

_____

[5] Tammy did offer proof of certain expenditures she had made on behalf of Xena.

[6] In making this statement we are assuming that the juvenile court had the opportunity to review the prior proceedings before the court commissioner.

to hire her own lawyer or represent herself. That information was an inadequate and incomplete statement of the law under *Joni B.*

¶ 31. We conditionally reverse the dispositional order. We remand for the juvenile court to address the question of court-appointed counsel for Tammy. If Tammy is financially eligible for such counsel and if she desires such counsel, then the juvenile court shall exercise its discretion and determine whether Tammy requires court-appointed counsel.[7] If Tammy is not financially eligible, does not desire such counsel or the court otherwise determines in its discretion that Tammy does not require the assistance of advocacy counsel, then the court shall reenter the dispositional order.

¶ 32. We stress the limited scope of our holding. We do not hold that a juvenile court must advise a parent of the court's authority to appoint counsel for the parent in every CHIPS case. However, when the parent requests counsel or when the circumstances otherwise raise a reasonable concern that the parent

---

[7] In making this determination, the juvenile court can look to, in addition to any other relevant criteria, the factors set out in *Joni B.*, 202 Wis. 2d at 19. *See supra* n.4. The court might also look to the criminal law for guidance in determining whether Tammy requires the assistance of appointed counsel. In a criminal setting, a court looks to factors such as the defendant's "education, literacy, fluency in English, and any physical or psychological disability which may significantly affect" his or her ability to communicate a defense. *State v. Klessig*, 211 Wis. 2d 194, 212, 564 N.W.2d 716 (1997) (citation omitted). Such a determination "should not prevent persons of average ability and intelligence from representing themselves unless 'a specific problem or disability can be identified which may prevent a meaningful defense from being offered, should one exist.' " *Id.* (citation omitted).

will not be able to provide meaningful self-representation, the court must exercise the discretion conferred by *Joni B.* whether to appoint counsel. Here, Tammy not only requested counsel at various stages of the proceedings, but her words and conduct, coupled with Hauer's report, demonstrated the possible need for the court to consider the appointment of counsel.

¶ 33.  Next, we turn to Tammy's complaint that Commissioner Bissett erred by appointing a guardian ad litem for her without first making a determination of her competency.[8]

¶ 34.  The appointment of a guardian ad litem is addressed to the trial court's discretion. *See F.R. v. T.B.*, 225 Wis. 2d 628, 643, 593 N.W.2d 840 (Ct. App. 1999). Here, Commissioner Bissett had ample reason to suspect that Tammy did not have the ability to determine what was in her best interests regarding this proceeding. The commissioner saw the need for a guardian ad litem based upon Hauer's evaluation and the court's dialogue with Tammy and first-hand observations of her at the hearings. In making the appointment, the commissioner referred to Tammy's "limitations." The commissioner properly exercised his discretion in appointing a guardian ad litem for Tammy.

¶ 35.  Tammy also complains that her guardian ad litem gave recommendations that were contrary to her desires. This argument is also without merit. The

---

[8] This issue is not rendered moot by our holding reversing the dispositional order. Since there will be further proceedings in the juvenile court and the guardian ad litem will presumably participate, we must address Tammy's contention that the appointment of the guardian ad litem in the first instance was improper.

guardian ad litem's recommendations were in keeping with a guardian ad litem's proper role. *See Wiederholt v. Fischer*, 169 Wis. 2d 524, 536, 485 N.W.2d 442 (Ct. App. 1992) (a guardian ad litem's role is to represent a person's best interests, not to advocate for his or her desires).

### Conclusion

¶ 36.   We hold that the appointment of a guardian ad litem for Tammy was a proper exercise of discretion and that the guardian ad litem properly performed his function. However, given the circumstances of the case, we hold that the juvenile court was obliged to exercise the discretion conferred by *Joni B.* whether to appoint counsel. We conditionally reverse the dispositional order and remand for the court to consider the appointment of counsel question. If the court concludes that the appointment of counsel is appropriate, the court shall appoint such counsel and conduct a new trial. If the court concludes that the appointment of counsel is not appropriate, the court is authorized to reenter the standing dispositional order.

*By the Court.*—Order reversed and cause remanded with directions.